## H. A. MONROE, *et al.*, v. MAY, WEIL & CO.

1. HUSBAND AND WIFE; *Contracts; Loans by Wife to Husband.* A loan by a wife to her husband of money she had at the time of her marriage, or has since acquired as the earnings of her personal labor and services, creates a valid indebtedness against her husband.

2. ——— *Repayment; Rights of Creditors.* A subsequent payment of such loan by the husband works no fraud upon creditors, and creates no trust in their favor.

3. HOMESTEAD; *Inviolability; Occupancy.* A purchase of a homestead with a view to occupancy, followed by occupancy within a reasonable time, receives from the time of purchase a homestead exemption from seizure upon execution or attachment.

4. ——— *Taking Title in Wife's name, no Fraud as to Creditors.* Where a husband owing his wife a debt for borrowed money, purchases a homestead, and upon his own motion, without any understanding or agreement with her, causes the title to such homestead to be taken in her name, creditors cannot insist that said act works a payment of the debt, and that a subsequent payment by him shall be considered as a gift, and the property given liable for their debts.

*Error from Atchison District Court.*

IN June 1870, *May, Weil & Co.* obtained a judgment against J. H. Ham and *A. Q. Monroe,* partners as Ham & Monroe, and execution thereon was issued and returned unsatisfied. Said *Monroe* owned and occupied a quarter-section of land in Atchison county, as a homestead. In December 1870 he exchanged this quarter-section to a Mr. Rose, for a house and lot in the city of Atchison, and $1,600 to be paid in money. Deeds were exchanged at that time, (Rose, at the request of *Mr. Monroe,* making the deed of the house and lot in the city to *Mrs. H. A. Monroe;*) and pursuant to an agreement then made possession was exchanged on the 1st of March 1871. In 1865 *Mrs. Monroe* loaned to her husband $340, which she had at the time of their marriage; and in 1870 she loaned him the further sum of about $570 which she had earned in teaching school, giving music lessons, and writing. "In December 1870 *Mr. Monroe* proposed to repay to *Mrs. Monroe* the money he had borrowed from her, and she concluded to purchase real estate with the same; and in

accordance with this arrangement *Mrs. Monroe* in person negotiated a trade with Mr. Wagenhols for the purchase" of another lot in the city of Atchison, "for the sum of $850," and afterwards her husband for her paid Wagenhols said sum and took a deed for the lot for and in the name of his wife. This suit was brought by *May, Weil & Co.* to subject said two lots in the city of Atchison to the payment of their said judgment against Ham & Monroe, upon the ground that the lots belonged to *Mr. Monroe.* The plaintiffs claimed that the taking the title in the name of the wife was a fraudulent disposal of property by the husband, void as to creditors, and that she held the title in trust for him. The defendants answered separately. Each alleged that the one lot was their homestead, and that the other was the separate property of *Mrs. Monroe.* The case was tried at the November Term 1871. The district court found that the house and lot first conveyed to *Mrs. Monroe* operated as a payment of the debt due to her, and that said property was the homestead of the family, and exempt, but that the other lot was the property of *Mr. Monroe*, and gave judgment subjecting the same to sale to satisfy the judgment of *May, Weil & Co.* From this judgment the *Monroes* appealed, and bring the case here by petition in error.

*C. G. Foster*, for plaintiffs in error:

The court erred in its conclusions of law, that, by the conveyance of the house and lot acquired from Rose, Mrs. Monroe "was fully paid by her husband," and that the other lot "was and is in fact the property of A. Q. Monroe," and subject to the satisfaction of his debts.

The money and property of any married woman in this state at the time of her marriage, and her earnings after her marriage, remain her sole and separate property, and are not subject to the husband's debts, and may be used and invested by her in her own name. Ch. 62, §§ 1, 4, Gen. Statutes. Mrs. M. had loaned this money to her husband with the agreement and understanding that it was to be repaid by him.

He did repay it; and such repayment will not be claimed as a fraud. It is based upon the highest principles of right and justice. It is guarantied to her under the statute. But the court below introduces a novel idea into the law of contracts, quite the reverse of that homely and yet forcible truism, that "It takes two to make a bargain." The court holds that by the deed of November 19th 1870 from Rose to Mrs. Monroe, for the house and lot (which the court very properly holds exempt as a homestead,) Mrs. Monroe was fully paid off by her husband. And this, notwithstanding the fact found by the court that "the deed from Rose for said lot 4 was made by the direction of Mr. Monroe (who made all the negotiations with Rose) in the name of Mrs. Monroe, but without her directions, and without any agreement or understanding between the parties that such conveyance was in satisfaction of the claim for the money loaned to her husband." Now if a debt can be paid in this way then no creditor is safe; for without his knowledge or consent, and against his will, the debtor may cancel and pay off his debt by a conveyance of land, or a sale of a lot of worthless chattels, to his creditor. (Chitty on Contr., 7, 8, and notes.) But the court finds that not until the month of December following did Mr. Monroe *propose* to pay the debt due his wife, and that "in accordance with this arrangement Mrs. Monroe in person negotiated a trade with Mr. Wagenhols for the purchase" of said lot 7. In the light of these *facts* can there be a doubt as to which lot was purchased by Mrs. Monroe, and received in payment of her debt? Yet the court holds that she was fully paid by the deed of lot 4, with the purchase of which she had nothing to do, and that lot 7, with which she had everything to do, is the property of Mr. Monroe.

But this is not all. After deciding that lot 4 paid Mrs. Monroe's debt the court finds as conclusion of law, that said lot 4 "was and is the homestead of defendant Mr. Monroe and his family, and not subject to any forced sale." That is, said lot is exempt from forced sale, not because it is *Mrs.* Monroe's property, (for the court says it is *Mr.* Monroe's,)

but because it is *his* (Monroe's) *homestead.* It paid *Mrs.*
Monroe's debt, yet it is not her property.

The court finds no fraud in this case; and the transactions,
as shown by the facts, are to be accepted as made in good
faith.

*W. W. Guthrie,* for defendants in error:

1. It is said that Mrs. Monroe loaned her money to her
husband to be repaid at some indefinite day; but the amount
of this pretended loan is only determined by "about so
much." No account was ever taken of the time, or amount,
by note, book account, or otherwise, nor time of payment
was ever kept, or could be found. All this time the wife
remained a member of her husband's family, and no sepa-
rate purses were kept, so far as appears. In November 1870,
Monroe sold *his* farm for $6,000, taking in part pay the
house and lot, (lot 4, in block 52,) at $3,000, and the balance
in notes and money—the house in his wife's name, the notes
in his. The money is not accounted for, except some was
given to his wife. The next month the other lot was bought
with the proceeds of these notes. Both deeds are kept from
record till after this suit was commenced. This secrecy is
accounted for when it is considered that defendants in error
had a judgment against Ham & Monroe, and this property
was not to be taken possession of till March 1st; and making
precaution doubly sure, the property is put in Mrs. M.'s
name, and then its existence concealed.

We insist that a wife may give her effects to her husband,
and that he will not be permitted to give back when insol-
vent; that the pretended loans in this case, if in case of
father and son, would be held in law to be a gift; that where
a wife permits her husband to use her money without any
separate account thereof being taken, it will be held in law
to be a gift. She has mingled it with that of her husband.
There has been a *confusion of goods,* with her consent.

But the case claimed is not one within § 4 of our married
women's act, relating to "the earnings of a married woman

from her trade, etc., either kept, or *used and invested by her in her own name*—which only applies to cases where the trade, etc., is carried on by the wife on her separate account distinct from her husband, not as *a member of his family*, and which earnings are thereafter kept distinct from her husband, and used, or invested by the wife in *her own name*. Here it is conceded that the husband took these earnings as they accrued, and used as he saw fit, both in time and manner, and without any separate account thereof being kept "in her own name." Had Mrs. M. died intestate, could her administrator have recovered these sums by law from Monroe? No more can the claim in this case be sustained. Nor could the claim be made if the money had been earned by making butter while the husband was at the head of and supporting his family; nor in teaching school, or music, or writing, until at least it is shown that it was so earned by the wife *separate* from her husband. The presumption is, that the wife is a member of her husband's family—he liable for her support, and entitled to her earnings.

Here it is contended, that a law to protect married women working on their "separate" account, will enable any wife of twenty years, who has been supported by her husband and occasionally earning some money, to bring her husband in her debt to the extent of his estate, and prevent any heritance descending to his children. We claim therefore, that both lots, as against the creditors of Monroe, were, both in December 1870, and March 1, 1871, his property.

2. But we contend that husband and wife by contract cannot transfer the *legal estate*, only an *equitable estate*, which *creditors may avoid*. 18 Ill., 579; 9 Ind., 347; 37 Ill., 205, 249. "Notes and *money*" are personalty. Any other rule would open the door to great fraud. But if there was a money transaction, (a loan, without date, account, or maturity,) it existed only in *equity;* and the deed in November 1870, for $3,000 of property, would in *equity* be held full payment. At least Mrs. M. cannot keep the property ($3,000) and say it has not paid her $900, either in law or equity. It

is not denied that she took the title in November *knowingly,* only that she did not *agree* to accept it as payment. But in December, knowing that she had already received from her husband $3,000, her husband *then insolvent,* she bargains with him to be paid with $850, and says it was a *bona fide* transaction. Her acceptance of the deed of lot 4 estops her from denying that said lot was in payment, if payment was due.

3. We insist that a man cannot have *two* homesteads, at once; that where he resides, *so long as he resides there,* is his homestead. "Occupied as a residence" by the family of the owner," (§ 9, art. 15, Const.,) requires actual occupation. See 1 Am. Law. Reg, 750, and cases cited; 21 Ill., 44; 5 Kas., 595. Had Monroe still owned the farm, while he was preparing to move on March 1st, while his family still remained where they had been for years, and remained till March 2d, would *the farm* have been liable to forced process? Was the farm less the homestead on March 1st, than Feb. 28th? Was lot 4 more a homestead on Feb. 28th, than lot 7? Had Monroe driven his loads and taken his family on the 2d of March to lot 7, would it not have been his homestead on that day? And if so, was lot 4 his homestead on the 1st of March? Does the *forming* the intention *make* the homestead, or the *execution* of the intention? As well say, that the betrothal and wedding-suit makes the lover the head of a family; or that the engagement-ring and veil, would entitle a bereaved virgin to dower. The legal edifices exist only when their construction has been consummated. They are *creations,* not original rights.

Lot 4 became subject to the lien of the execution in favor of May, Weil & Co. on March 1st, by the sheriff's levy; code, § 444; 9 Minn., 108. Like a mortgage, the title of the purchaser on foreclosure dates with the attaching of the lien. The sale is the *enforcement* of the lien. If *occupation* as a homestead exempts from *sale,* the owner of several houses, by six moves per year, could, however far behind a *lien,* always keep ahead of a *sale.*

The opinion of the court was delivered by

BREWER, J.: May, Weil & Co., judgment creditors of A. Q. Monroe, brought their action to subject to their judgment two pieces of real estate in the city of Atchison, standing in the name of Mrs. H. A. Monroe the wife of the judgment-debtor. As to one piece, the district court found that it was the homestead of the Monroes, and therefore exempt. The other it found was subject to the lien of such judgment, and ordered it sold in satisfaction thereof. This portion of the findings and decree the plaintiffs in error seek by this proceeding to reverse.

The case was tried by the court without a jury, and the facts specially found. The testimony was not preserved in the record, so that the only question before us, is, whether the facts found support the conclusions of law and the judgment. The material facts are these: Mrs. Monroe had at her marriage a small sum of money, and during the year 1870 earned a little larger sum by teaching and writing. These two sums by our laws were her absolute property, and not liable for her husband's indebtedness: Ch. 62, §§ 1, 4, Gen. Stat., 562. She could loan them to any one, not excepting her husband, and thereby create a valid indebtedness to herself personally. She did loan them to her husband upon an agreement that they should be repaid to her at some time in the future. As against the *bona fides* of this transaction, and the validity of this indebtedness, there is nothing in the findings to raise a suspicion. True, there was no time fixed for the repayment; but a loan on call, or for an indefinite time, is no curiosity in business transactions between strangers. The amount earned by teaching and writing in 1870, as found by the court, was "about $570." Whence the uncertainty, as to the exact sum, arose, we can only conjecture. We are not at liberty to conjecture bad faith. It might spring from a doubt in the mind of the court as to its recollection of the testimony. It might result from a difference between the witnesses in some small item, or from

*1. Loans by a wife to her husband.*

an over-cautious method of statement by one or other of the parties. It might very naturally arise from the mutual confidence and trust of husband and wife. Neither doubting the other, and never contemplating a controversy with strangers, it would not be strange if both were unable to name the exact cent. But whatever may have been the cause of this indefiniteness, one thing is of old settled law — wrong-doing, bad faith, are matters of proof, not presumption. A *bona fide* indebtedness of about $910, from husband to wife, then, existed, as found by the court. The payment of this indebtedness would be no fraud upon creditors, create no trust in their favor. In December 1870 this sum, or nearly this sum, was paid to Mrs. Monroe in this way, the payment being made upon the suggestion of Mr. Monroe, and by agreement between them. She negotiated with a Mr. Wagenhols a trade for a lot at the price of $850. "Two or three days thereafter she sent her husband as her agent to Mr. Wagenhols with directions to look at the property, and, if it answered Mr. Wagenhols' description, to pay Mr. W. $850, and receive the deed for her." He went as directed, found the property as represented, paid the money, and took the deed in her name. This by their agreement was a repayment of the money borrowed. Who could be wronged by it? The right of a debtor to pay one creditor in full, before paying another anything, is absolute, and unquestioned. It is no wrong to the latter. Mrs. Monroe was, so far as this transaction is concerned, her husband's creditor, would have shared with other creditors in a distribution by an assignee of her husband's property, and could rightfully receive payment in full before any others received a cent. It may be said such rule as this opens the door to fraud; that a husband may borrow money from his wife, go into business, receive credit on the strength of his apparent property, live extravagantly for years, and the moment any pressure comes, pay his wife in full and let the other creditors who have trusted him go without anything. In this way a man may live on his creditors'

<span style="float:left">2. Repayment; rights of creditors.</span>

property. The same thing might happen if a man disposed to fraud was doing business on capital borrowed of anybody else. Whether further legislation be needed in such cases, is not for us to say. Whether the secrecy of such loan might not sometimes invalidate it, is a question to be decided when fairly presented. It is enough, in this case, to decide, that the repayment, in good faith, of a loan from his wife, does not defraud the other creditors of the husband, or create a trust in their favor.

The questions thus far discussed are in this case hampered with others which we must now consider. In September 1869, Mr. Monroe purchased a farm for $3,700, took a deed in his own name, and occupied it as a homestead. This was 3. Homestead; before he had borrowed from his wife any but its inviolabil- ity. the $340 at the time of their marriage. In November 1870, he sold and conveyed this farm, receiving in exchange a house and lot in Atchison, and $1,600 in notes secured by mortgage. Possession by agreement was to be exchanged on the 1st of March following. It was so exchanged, and thereafter this city property was occupied and claimed by the Monroes, as their homestead. The deed for the house and lot was made to Mrs. Monroe. This was done by direction of Mr. Monroe, "and without any agreement or understanding between the parties that such conveyance was in satisfaction of the claim for the money loaned her husband." One of the notes taken in payment of the farm was used in the purchase of the lot from Mr. Wagenhols. The conclusion to which the court below came, was, that the house and lot received in exchange for the farm were exempt as a homestead, but that placing the title to this homestead in the name of Mrs. Monroe was in equity a payment of the indebtedness to her, (the consideration expressed in the deed for this property being $3,000,) so that the subsequent deed of the Wagenhols lot was in effect only a voluntary conveyance of the husband's property, which could be set aside, and the property reached by creditors. That the homestead exemption covered the Rose house and

lot, seems to us clear. True, there was a period of time between the execution of the conveyance, and the taking of possession. But the transaction, as it appears to us, was no more than the exchange of homesteads. Mr. Monroe traded his homestead in the country for one of less value in the city. When he gave possession of the one, he took possession of the other. There was no intermediate homestead. Now, all legislation must be construed with reference to settled usages, necessary facts. No man will enter premises until he has some right to enter. The right is determined before the entry is made. Occupation of a homestead succeeds, in point of time, its purchase. This is true, except in a few instances, as, where one buys a house he has theretofore occupied as tenant. To give a fair and reasonable interpretation of the homestead law, this fact must be recognized. The purpose of that law was to secure to each family its homestead. We may not defeat this beneficent purpose by strict, technical, arbitrary constructions. As we said in the case of *Edwards v. Fry*, (ante, 417, 425,) "A purchase of a homestead with a view to occupancy, followed by occupancy within a reasonable time, may secure *ab initio*, a homestead inviolability." A man may sell his homestead, and give good title, no matter how many judgments may be standing against him. *Morris v. Ward*, 5 Kas., 247. The proceeds of that sale he may reinvest in a homestead, and though he do not actually occupy until after he has completed his purchase, and secured his title, still, if he purchase it for a homestead, and enter into occupation within a reasonable time thereafter, no lien of existing judgments will attach. We need not however pursue this branch of the case any further, for the plaintiffs in error make no complaint of it; and though defendants in error took exceptions, and have discussed the question in their brief, the case is not so before us as that we could give them any affirmative relief. We have said thus much, and indicated our views on the question, to save further litigation on the part of defendants in error.

We come now to the remaining question involved. Was

the act of Mr. Monroe, in placing the title to the homestead in his wife, a payment of his indebtedness to her? After a careful consideration of the question, we are constrained to answer it in the negative. A debt cannot be paid with anything but money, except by the consent of the creditor. No amount in value of property will cancel a debt, unless the creditor choose to accept it. He who loans money has a right to insist that money be returned. That is the only legal tender. And though Mr. Monroe intended the homestead as payment, it needed Mrs. Monroe's consent before it became payment. But the findings show that neither party intended or considered it payment. They intended and made payment in another way. Nor is there anything in the transaction of which creditors can complain, or upon which they can base any equity. It was a matter of entire indifference to them whether the homestead was in the husband's or wife's name. In either case it was exempt from their claims. If placing the title in the wife's name had removed so much property from the reach of their claims, it might give them some pretense for insisting that no more property should be thus removed. But where the homestead is alike exempt whether in the husband's or wife's name, we fail to see why placing it in the wife's name gives the creditors a right to call that a gift which the parties made a payment. It is of equal logic with that which would hold that placing a homestead in a wife's name was a conveyance to defraud creditors. The homestead is something toward which the eye of the creditor need never be turned. It is an element which may never enter into his calculations in his efforts to collect his debt. He may as well ignore that, as he does now (except in cases of fraud) the body of the debtor. Entertaining these views, it seems to us the judgment in the district court should have been entered on the findings for the defendants, the plaintiffs in error here. The case will therefore be remanded to that court, with instructions to set aside the judgment heretofore entered, and to render judgments for the defendants in that court, for the costs of suit.

All the Justices concurring.

<div style="margin-left:2em">4. Title to home-<br>stead.</div>