## FARWELL v. BROWN.

(*Circuit Court, W. D. Wisconsin.*   February 13, 1880.)

ATTACHMENT—PREFERENCE OF CREDITORS.—The preference of a *bona fide* creditor does not authorize the issuing of an attachment upon the ground that the defendant has disposed of his property with the intent of defrauding his creditors.

BUNN, J.   This case comes up on a traverse of the plaintiff's affidavit, upon which an attachment was issued.

The affidavit states that deponent has good reason to believe that the said defendant has assigned, conveyed, disposed of or cancelled his property with intent to defraud his creditors; and that said defendant is about to abscond from the state of Wisconsin, to the injury of his creditors.   There was no proof offered under the charge of absconding from the state, and the sole issue is whether the defendant had conveyed or disposed of his property with intent to defraud his creditors.

This is clearly the issue, and not simply whether the deponent, at the time of the making of the affidavit, had reason to believe the defendant had fraudulently conveyed or disposed of his property with such intent.   The deponent's reason to believe was a material fact for the purpose of suing out the writ, but counts for nothing when the facts constituting the ground for sustaining the attachment are denied.   Here the parties come to closer quarters, and use facts, instead of reasons for belief, for their weapons.

The defendant had in fact conveyed and disposed of the greater part of his property, consisting of a stock of goods, and some notes and store accounts, to his brother, P. E. Brown, and the issue to be tried is whether the sale was made with the intent to defraud the defendant's creditors.   If it was, the attachment must be sustained, otherwise not.

The defendant, previous to August 12, 1879, had, since the fall of 1872, been a merchant at Belmont, Wisconsin.   In July, 1878, his health failing, he sent for his brother, P. E. Brown, to come and take charge of the store and carry on the business for him.   Defendant remained sick in Chicago some seven weeks, and after coming home, not getting any better,

went to the Hot Springs in Arkansas for his health, in April, 1879, and remained until August of same year, during which time P. E. Brown carried on the business for him. Defendant testifies that during his sickness his expenses and those of his family were very large, and that when he returned from Arkansas he found he could not meet all of his payments. On the twelfth of August, 1879, he took an inventory and sold out his stock of goods, $200 worth of notes and $1,700 of accounts to his brother. The stock inventoried at cost prices $4,581.95, from which was discounted 25 per cent., making the price at which the goods were sold $3,436.46, which, with the notes and accounts, made $5,336.46.

The Browns both testify that at the time of this sale the defendant was indebted to his brother in the sum of $2,680.92; that $2,080.92 of this was for money advanced by P. E. Brown to defendant to pay claims for goods purchased by defendant in his business, and $600 was for 10 months' work in the store at $60 per month.

Defendant also testified, and in this he is corroborated by his brother, and I see no reason to doubt the fact, that he was indebted to his own wife in the sum of $1,307.45, for money he had had from the proceeds of her separate estate, and which it was the understanding that he should pay back. A farm at Warren, Illinois, had come to her from her uncle's estate, and which she had sold for $4,700. Her husband received the two last payments, amounting to $1,307.45, and put into his business with the above understanding. He had also received the previous payments and put them in his business, and had never repaid any part of it.

The agreement on the sale of the goods, as testified to by the two Browns, was that P. E. Brown should cancel the defendant's indebtedness of $2,680.92 to him, which he did; pay defendant's wife the said indebtedness of $1,307.45, for which he gave his note at the time of the sale and has since partly paid, I believe all but about $300; and assume a bank indebtedness of $877.94, due by defendant to Northrup & Co., bankers at Belmont, for which he also gave his note, which

he has since nearly paid up; and to balance the account gave defendant his note for $470.15, which he has also paid in full.

P. E. Brown took possession on the sale, and remained in possession up to the time the goods were attached, about the last of August, 1879. The evidence all tends to show that the consideration paid for the property was adequate; and the fact that the stock was sold at 25 per cent. below the invoice price is no evidence to the contrary.

R. H. and P. E. Brown both swear it was all the stock was worth; that P. E. Brown afterwards offered and tried to resell it for what he paid, but could not, and that it was inventoried in the attachment proceedings at $3,000. The plaintiff has not even undertaken to prove that the goods were worth more than P. E. Brown paid for them, but relies in good part upon the testimony of one Joseph Brown and A. E. Campbell, to show actual intent on the part of the defendant to defraud. Campbell was the attorney of Farwell & Co., and went to Belmont to secure this claim soon after the sale to P. E. Brown, about the last of August. He found the defendant in the store, and had a conversation with him; saw him selling goods and giving instructions to clerks, or supposed he did. Defendant told him he could not pay, and that he had sold out to his brother. He says defendant refused to give him any statement of his affairs; that he refused to let him see his books, or to make any explanation or give him any satisfaction. All of which the defendant denies, and says he told him about his indebtedness, and all about the sale to his brother and the consideration, and that he had a dispute about the statement defendant had given plaintiff as to his financial condition, and that Campbell threatened him with criminal prosecution in Chicago, and talked to him in a very ugly way about it, and that while he was so talking he refused to give him any explanation, but afterwards he talked to him about his sickness and the heavy expenses he had been to, and told him about the sale and the consideration for it, and that they took dinner together and were more friendly.

Joseph Brown was an agent or runner for L. Z. Farwell, of Freeport, and came to Belmont in August to get a claim of $171 secured. He says defendant refused to pay or secure his claim until he had time to look over his books and see what shape he might be in; that defendant said he thought he could pay all his claims; that if he could not pay all he wanted to pay all alike, *pro rata;* that he had taken the step he had to protect himself, or secure himself; that he was afraid some of his creditors might come in on him and close him up; that he expected to be back doing business again after he got settled up; that he also had a talk with P. E. Brown at the store, in which he said he had all the stock and could not do anything for him; that afterwards he bought some goods of him, and then at his wagon said he was sorry they had been obliged to do as they had, but he was afraid, or they were afraid, some unprincipled creditor might come in on them and close them up, and they did it to protect themselves; that he expected R. H. Brown would be back again in the store doing business. These statements are positively denied by both the Browns.

Defendant swears that in making the sale his intention was to pay his brother, and Mrs. Brown, and the banker; that he thought his obligation to them was greater than to any other creditors; that he did not have enough to pay all, and so paid those to whom his obligation was greatest; that he was in a very precarious condition of health, and did not know as he would live long; that he did not want to leave his own family without a dollar; that he made the sale thinking it the best he could do in his circumstances, and that he had no thought nor intention of delaying or defrauding his creditors. The property he turned over to his brother was all he had, except about $3,000 in notes, which came to him on a dissolution of the firm of Brown & Co., in 1878, of which he and his brother and father were members. That these notes were not very collectible, and that he owed about $3,000, besides the amount that he owed his wife. These are the most material points in the testimony, which is quite voluminous.

Upon the whole case I think, if the indebtedness to his brother and wife and to Northrup & Co. was genuine, the defendant had the right to prefer them to his other creditors in the way he did, although the effect might be to hinder or delay, or even prevent entirely, the collection of the claims. And I have no reason to doubt, from the evidence, the genuineness of either of these debts. They are positively sworn to by both R. H. and P. E. Brown, with all circumstances of time, place and occasion, which it would be very dangerous, if not impossible, to create if the facts were not so. And there is no opposing testimony. The fact that one preferred creditor is a brother and another a wife, is, of itself, enough to raise suspicion of good faith and put the court on its guard; but, when the indebtedness is clearly proven, there is no doubt but a debtor may prefer his own wife and brother, and that they stand on a like footing with other creditors. *Hill* v. *Bowman*, 35 Mich. 191; *Waddams* v. *Humphrey*, 22 Ill. 661–663; *Giddings* v. *Sears*, 115 Mass. 505; *Banfield* v. *Whipple*, 14 Allen, 13; *Ferguson* v. *Spear*, 65 Maine, 277; *French* v. *Motley*, 63 Maine, 326–328; Bump on Fraudulent Conveyances, 218–223; *Waterman* v. *Donalson*, 43 Ill. 29; *Smith* v. *Acker*, 23 Wend. 653–679; *Beard* v. *Deloph*, 29 Wis. 136–140; *Carpenter* v. *Tatro*, 36 Wis. 297–301; *Monroe* v. *May*, 9 Kan. 466.

The declarations and admissions of defendant and his brother, allowing them to have been made as testified to by Joseph Brown, would hardly show more than an intent to delay the other creditors. But the allegation in the affidavit is that the defendant had conveyed or disposed of his property with intent to defraud, and an intent to hinder and delay is not made, under the statute, one of the grounds for issuing an attachment. What the plaintiff must prove to sustain the issue is an intent to defraud, and so long as the defendant had the right under the law to prefer and pay in full the creditors whom he did pay, though it took the most of his available property, and the effect undoubtedly was to delay or perhaps wholly prevent the other creditors from collecting their claims, these declarations of the defendant, in regard to the intent of the transaction, have much less bearing than

they would otherwise have. Fraud is not to be presumed without pretty strong proof, where the debtor, so far as his acts go, is doing only what the law fully sanctions.

I am satisfied, from all the evidence, that the controlling motive of the defendant in making the sale was to prefer his brother, his wife, and Northrup & Co., as creditors, and that the sale was made in good faith for that purpose.

Attachment dissolved.